FRANK CASADY et al., Appellants, v. SIMON CASADY, Appellee.

**ADVERSE POSSESSION:** Undelivered Deed as Color of Title. A duly executed and acknowledged, but *undelivered*, deed furnishes no color of title to the grantee.

**GIFTS:** Insufficient Evidence of Delivery. A completed gift may not rest on a mere promise *inter vivos* to make a gift, nor on any length of possession which was, originally, permissive only, unless there be *some* evidence that such permissive possession was broken, and that the subsequent possession was referable to *some* promise that the possessor should *then* have the property as his own.

ADVERSE POSSESSION: Permissive Possession Presumed to Con-
3 tinue. A possession which was, in its inception, *permissive* only,
will be presumed to so continue.

*Appeal from Polk District Court.*—Lawrence De Graff,
Judge.

December 14, 1918.

Suit in equity to set aside deed, and to quiet title to
land. On trial to the court, the petition was dismissed,
and plaintiffs appeal. The material facts are stated in the
opinion.—*Affirmed.*

*F. T. Van Liew,* for appellants.

*Henry, Alberson & Henry,* for appellee.

Weaver, J.—Frank Casady, senior, now deceased, was
the brother of the defendant, Simon Casady, and father of
the plaintiffs, Frank Casady, junior, Harry Casady, E. E.
Casady, and Augusta Freed. The father of

1. Adverse pos-     Frank Casady, senior, and Simon Casady,
session: un-
delivered deed     was P. M. Casady, now deceased. P. M.
as color of
title.              Casady died intestate, August 31, 1908,
leaving surviving him his wife, his two sons
above named, and two grandchildren, children of a deceased
daughter. The son, Frank Casady, senior, died intestate,
January 19, 1916, leaving the plaintiffs herein his heirs at
law. P. M. Casady was a pioneer settler at Des Moines, a
lawyer of note, and prominent banker and man of business.
Many years before his death, he came into the ownership of
200 acres of land, in the immediate vicinity of the city.
About the year 1882, Frank Casady, senior, moved upon a
40-acre tract of this land, where, with some interruptions,
he made his home during the remainder of his life. That
this was done with the knowledge and consent of P. M.
Casady is clear, but of the details or particular terms, if

any, then made between father and son, concerning the land or its possession, there is little, if any, testimony. The business relations and dealings between them from this date forward will be somewhat better understood when we say that the son, Frank Casady, senior, was addicted to the intemperate use of intoxicating liquors, a habit which evidently convinced his father that property entrusted to his absolute ownership was quite sure to be wasted. In the year 1900, P. M. Casady, apparently by way of advancement, conveyed 160 acres of the land, in tracts of 40 acres each (but not including the 40 acres occupied by Frank), to members of his family other than Frank. At or about the same time, he prepared a deed of gift of the 40 acres in controversy to Frank Casady and Kitty Casady, his wife, as joint tenants for life, with remainder, at the death of the survivor, to their children. The deed was duly signed and acknowledged by P. M. Casady and wife, but appears never to have been delivered to Frank. After the death of the father, the instrument was found in a pocketbook in his desk, by his administrator. The evidence tends to show, however, that he, on or about the date of the deed, spoke of his purpose to give Frank a life estate in the land, with remainder over to Frank's children. On September 16, 1901, one year and five months after the date of the undelivered deed, a written contract was made and entered into between P. M. Casady and wife, and Frank, senior, and wife, in words as follows:

"This agreement, entered into this 16th day of September, 1901, between Phineas M. Casady and Augusta Casady, of the first part, and Frank Casady and Kittie Casady, of the second part, witnesseth:

"That, in consideration of the parties of the first part paying unto the parties of the second part during their natural lives the sum of one thousand dollars per annum, in monthly payments of eighty-three and 33-100 dollars,

commencing October 1, 1901, the said parties of the second part hereby relinquish all their interest in and to the estate of the parties of the first part.

"And it is further agreed between the parties that, in the event of the death of either of the parties of the second part, the sum of five hundred dollars per annum in monthly sums of forty-one and 66-100 dollars shall be paid to the survivor during his or her natural life.

"It is distinctly understood and agreed to by all the parties hereto that this contract and agreement shall not be pledged or assigned to anyone for money advanced or loaned or used as collateral.

> "(Signed)   Phineas M. Casady.
> "Mrs. Augusta Casady.
> "Frank Casady.  *
> "Mrs. F. Casady. .

"Witnesses:

> "Miss Augusta Casady.
> "E. E. Casady.
> "Frank Casady, Jr.
> "Harry Casady."

The annuity provided for by this agreement was paid each year by P. M. Casady during his lifetime, and thereafter by his administrator, until the death of Frank and his wife. On October 18, 1915, Frank Casady, senior (his wife being then deceased), executed and delivered to his brother, Simon Casady, defendant herein, a quitclaim deed for the 40-acre tract in controversy. The expressed consideration for the deed was $2,000, payable, $500 on the execution of the deed, and the remainder on March 1, 1916, at which time the grantor would deliver possession to the grantee. As already noted, the grantor died in January, 1916, before the date provided in the deed for the delivery of possession; but on or soon after such date, the defendant assumed the possession, and has since retained it.

In this action, the plaintiffs allege that their grandfather, P. M. Casady, conveyed the land to their father for life, with remainder over to them; that, although there was no manual delivery of the deed, it was deposited and preserved for the benefit of the grantees therein named; that their father, in pursuance of such deed and such understanding or agreement with the said P. M. Casady, went into possession of the property and retained the same, under color of title, for more than ten years; and that such title has been so established and confirmed by adverse possession. Plaintiffs further allege, in avoidance of the conveyance made by their father to the defendant, Simon Casady, that the said Frank Casady, senior, at the date of said instrument, had become and was so debilitated in body and mind by reason of his intemperate habits as to be incapable of making a valid conveyance, or of intelligent comprehension of the meaning, nature, or effect of such transaction upon his personal or property rights; and that the defendant, Simon Casady, wrongfully took advantage of his weak and helpless condition, to procure from him a deed for the property at a price which was and is grossly inadequate. The defendant denies that Frank Casady, senior, ever had or acquired any title to the land; denies that the deed signed and acknowledged by P. M. Casady in the year 1900 was ever delivered to the said Frank, or delivered to or deposited with any other person for his use or benefit, and denies that the conveyance from Frank was obtained by fraud or undue advantage, or that Frank was mentally incompetent to make such conveyance.

By way of cross-petition, defendant alleges title in himself; that such title was derived, in part, by inheritance from his father, who died intestate, seized of the title to said land, and in part by conveyance from the other heirs entitled to share in the estate of his father; that, by reason of the contract of 1901, between the father and Frank,

the latter took nothing by way of inheritance from the former; and that neither he nor his children, the plaintiffs, ever acquired any right, title, or interest in this property. Defendant therefore prays a decree quieting the title in himself, against the adverse claims of the plaintiffs.

After hearing the evidence, the trial court found the equities to be with the defendant, dismissed the bill, quieted the defendant's title, as prayed; and plaintiffs appeal.

Before the issues came on for hearing in the trial court, Augusta Freed, named as one of the plaintiffs, was permitted to withdraw from the case, and she had no part in the trial or adjudication.

I. Counsel for appellants start with the proposition that the deed prepared by P. M. Casady to his son Frank, in the year 1900, operated to give the latter color of title, and that possession thereunder for ten years or more was sufficient to establish his right against the father and all persons claiming by or under him.

But we think that no authority goes to the extent of holding that a deed of which there has been no delivery, either actual or constructive, affords "color of title" upon which title by adverse possession can be acquired. Color of title is most commonly defined to be that "which in appearance is title, but in reality is no title." *Wright v. Mattison*, 59 U. S. 50 (15 L. Ed. 280). The deed in question was not defective, in form or substance; and, if delivered, would have evidenced an actual, complete, and valid transfer of title, and not mere color of title; but, so long as it remained undelivered, in the hands of the grantor, it had no more legal effect than an unsigned and unexecuted blank form; and possession professedly taken and held under or by virtue of such an instrument can never ripen into title. Indeed, so far as we can find from the record, there appears to be no competent evidence that the making or existence of this deed was known to Frank or to his children, until aft-

er the death of P. M. Casady. If, therefore, plaintiffs have any right or title to the property, it must be found elsewhere than in this deed.

But counsel say there was a parol gift by P. M. Casady to his son Frank of a life estate, with remainder over to his children, and that this gift was followed by possession, use, enjoyment, and improvement by Frank and his family, thus perfecting a transfer of the title, and making the gift irrevocable. It does not appear, however, that Frank took or held possession under any agreement or understanding that the land was being given to him or to his family. Indeed, he had been in the possession, or at least had been living upon the land, for nearly, or quite, eighteen years, before this deed was drawn, or anything done by his father looking to a distribution of the property among the members of the family; and, so far as appears upon the surface, the manner and extent of Frank's possession continued unchanged, to the end of his life. The claim asserted by the plaintiffs that there was a gift of the land in 1900 is, therefore, without the support of any presumption or inference which might have arisen if the entry of Frank into the possession had, in fact, followed, or had been coincident with the date of the undelivered deed, or with the conveyance of the rest of the 200 acres to others of his father's prospective heirs. It is doubtless true that P. M. Casady did contemplate making the gift to Frank and his family effective by the delivery of the deed, but it is no less clear that, for some reason, he hesitated, and withheld it. It is perhaps an allowable inference that knowledge of his son's bondage to the drink habit led him to doubt the wisdom of a gift in that form; and this inference is somewhat strengthened by the circumstance that, in the following year, he entered into a written obligation to furnish the son an annuity of $1,000 during life, thereby in some degree in-

2. GIFTS: insufficient evidence of delivery.

suring him against absolute want, to which his reckless habits exposed him. Whether this be the true explanation or not, the plaintiffs are here met with the stubborn fact that the deed was, in fact, withheld, was never delivered, and therefore it is without life, force, or effect.

II. We think it equally certain that the evidence fails to establish any gift by parol. There is, as we have just said, enough to show that the father did have in contemplation the gift of a life estate to Frank, and it may be that the record would justify a finding that he gave Frank some assurance or promise to the effect that such gift would be made in due time; though his conduct would indicate that the consummation of such gift was held in abeyance by reason of doubt whether a favor of that kind would prove of any substantial benefit to his son; for the same improvidence which could waste or dissipate a fee title could also waste or dissipate a life estate. But whatever may be the truth as to the motive actuating the father's conduct in this respect, the fact that he withheld the deed is very significant of his conviction that the time had not arrived for consummating the gift by a transfer of the title. A mere intention to give in the future, however well proven, gives rise to no obligation which the law will recognize or enforce. Nor will a promise to make a gift *inter vivos* vest any right or title in the donee, except where the promise is followed by performance, in the surrender of possession or dominion over the alleged subject of the gift.

3. ADVERSE POSSESSION: permissive possession presumed to continue.

These propositions are elementary, and require no citation or review of the authorities. It is contended for appellants that, in this case, there was a delivery of possession to Frank, and an exercise by him of dominion over the property sufficient to answer these requirements. It is true that Frank did have possession of this land, lived upon it, leased it to others, improved it to some extent, in a manner

consistent with a claim of right or ownership; and, as we have already said, this circumstance would be of much weight in support of plaintiffs' contention, were it not that his possession, use, and control of the premises were begun years before the evidence discloses any claim of title by Frank, or any suggestion by his father of a purpose to give him the property. He was undoubtedly given a somewhat free hand in the use and enjoyment of the property; and, so long as the father retained the title and ownership, the latter was apparently content to permit the son to have a home thereon, and such support, enjoyment, and profit as he could obtain therefrom, without any rental charge. In the absence of proof to the contrary, the right under which the possession and use were originally taken will be presumed to have continued. In other words, Frank's possession and use of the land, when originally taken, were permissive only; and, in the absence of other evidence, the mere continuance in such use and possession will be presumed to retain that character. Stated otherwise, continuance in a use and possession of land which were permissive in their origin constitutes no evidence of gift, nor will such possession, by mere lapse of time, become hostile or adverse to the person under whom it was taken. *McClenahan v. Stevenson,* 118 Iowa 106. The burden was, therefore, upon the plaintiffs to rebut the presumption that Frank's possession, admitted to have been originally subject to the title and ownership of his father, ever became otherwise, by perfected gift *inter vivos,* or by some change of attitude or circumstances operating to make such possession hostile and adverse to the father's title, for a period of ten years. In our judgment, the evidence in the record is insufficient to remove this burden in either respect.

III. The allegation that Frank Casady was mentally incompetent to make a deed at the date of his quitclaim to Simon Casady is not sustained by the evidence, nor is there

any testimony tending to show that Simon Casady exercised any undue influence over him in obtaining the deed, or deceived or misled him in any way in respect thereto. It does appear that Frank was, to a great extent, a pitiable physical wreck, from excessive drinking, and that he was often intoxicated; but there is nothing to indicate that, when sober, he was not competent to understand the meaning and effect of ordinary business transactions. Nor is there any evidence that, at the time of making this deed, he was intoxicated, or not in possession of a sound mind.

The conclusions already announced render unnecessary any ruling upon appellants' contention that the agreement by which Frank, in consideration of a life annuity, relinquished all claims to share in his father's estate, did not operate as a waiver or relinquishment of his claim to a life estate in the 40-acre tract. Having failed to establish plaintiffs' claim that such a life estate was created, the effect which the relinquishment of Frank's heirship in the estate of his father might have had upon his life estate, had one been created, is wholly immaterial.

The case appears to have been correctly decided by the district court, and the decree therein is—*Affirmed.*

PRESTON, C. J., GAYNOR AND STEVENS, JJ., concur.